## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **COMPLETE DISTRIBUTION SERVICES, INC.**, | Case No. 3:13-cv-00800-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **ALL STATES TRANSPORT, LLC**, | |
| Defendant. | |

John A. Anderson and Keven M. Anderson, ANDERSON & YAMADA, P.C., 9755 SW Barnes Road, Suite 675, Portland, OR 97225. Of Attorneys for Plaintiff.

Flavio A. Ortiz and Martin M. Rall, LACHENMEIER ENLOE RALL & ORTIZ, 9600 SW Capitol Highway, Suite 200, Portland, OR 97219. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Complete Distribution Services, Inc., ("CDS") is a registered freight broker; it arranges for the transportation of freight but does not transport any freight itself. Defendant All States Transport, LLC ("AST") is an interstate motor carrier registered with the Federal Motor Carrier Safety Administration; it offers motor vehicle transportation for hire. This dispute arose after an AST long-haul truck crashed while transporting goods for one of CDS's customers. CDS moves for summary judgment on its first claim for relief under the Carmack Amendment, its

PAGE 1 – OPINION AND ORDER

second claim for relief for breach of contract, and its third claim for relief for offset. Dkt. 86. CDS also moves for summary judgment dismissing AST's counterclaims for breach of contract, money had and received, and consequential damages. *Id.* After considering the parties' arguments and evidence, the Court DENIES CDS's Motion for Summary Judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

In December 2012, CDS contracted with Pacific Nutritional, Inc. ("PNI") to arrange for transport of two shipments of vitamins and nutritional supplements from PNI's Vancouver, Washington, facility. CDS hired AST to transport one of the shipments to Clearwater, Florida, and the other to Tampa, Florida.

On December 7, 2012, AST picked up the shipments in two separate trucks. Without informing CDS or PNI, AST later combined the two shipments onto one truck for transport. The next day, December 8, 2012, the AST truck carrying PNI's shipments crashed on Interstate 84 in eastern Oregon. PNI claimed the crash resulted in $169,844.47 of damages to its products.

CDS voluntarily paid to PNI the full amount of PNI's claims in return for a full and complete release and assignment of PNI's claims arising out of the crash. CDS then forwarded the assigned claims to AST's cargo insurance carrier, Certain Underwriters at Lloyds, London ("Lloyds"). Lloyds agreed to pay CDS $88,392.50 pursuant to AST's policy limit of $100,000 on an individual truck.[1] In return for the payment, CDS granted a full release to Lloyds, but CDS retained all rights and claims for the remaining balance of what it had already paid to PNI.

On May 13, 2013, standing in the shoes of PNI under the Carmack Amendment, 49 U.S.C. § 14706, CDS filed suit against AST for freight loss and damages. CDS seeks the remaining balance of the PNI claims. CDS also brought claims for breach of contract and offset. AST filed its answer, including affirmative defenses and counterclaims. CDS moved to dismiss AST's counterclaim for negligence and to strike a number of AST's affirmative defenses. United States Magistrate Judge Dennis J. Hubel issued his Findings and Recommendation ("F&R") , which this Court adopted in part, dismissing AST's counterclaim for negligence, striking AST's affirmative defenses of negligence and fault of others, and dismissing CDS's breach of contract claims for 89 other alleged instances in which AST allegedly combined multiple loads onto one truck.

---

[1] Lloyd's paid CDS $88,392.50, as opposed to $100,000, because of various credits and deductions. In addition to the $100,000 face amount of the policy on the one truck, the policy also paid out $5,000 for debris and cargo removal from the accident site. Thus, there was actually $105,000 available. From this amount Lloyd's deducted a $1,000 deductible and also paid out $15,607.50 for debris removal and conservation of the load, reducing the net amount payable to $88,392.50. Dkt. 93-3 ¶ 2.

CDS now moves for summary judgment on its three remaining claims for relief: its claims under the Carmack Amendment, breach of contract, and offset. CDS also moves for summary judgment dismissing AST's counterclaims for breach of contract, money had and received, and consequential damages.

## DISCUSSION

**A.  CDS's Claims for Relief**

### 1.  The Carmack Amendment

The Carmack Amendment to the Interstate Commerce Act governs all interstate contract shipping claims concerning "delay, loss, failure to deliver and damage to property." *White v. Mayflower Transit, L.L.C.*, 543 F.3d 581, 584 (9th Cir. 2008); *see* 49 U.S.C. § 14706. Under the Carmack Amendment, "in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages." *Mo. Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964). After the shipper, or other person entitled to recover under the bill of lading,[2] makes out this prima facie case, "the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Id.* The United States Supreme Court recognizes only five excepted causes: "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Id.* at 137 (quotation marks omitted).

---

[2] The person entitled to recover includes the entity to which a shipper assigns its claims under the bill of lading. Often this is the broker. *See Windows, Inc. v. Jordan Panel Sys. Corp.*, 177 F.3d 114, 118 (2d Cir. 1999); *TransCorr Nat. Logistics, LLC v. Chaler Corp.*, 2008 WL 5272895, at *4 (S.D. Ind. Dec. 19, 2008).

### a.  Measure of Damages

Measuring a party's damages is an imprecise science. Liability under the Carmack
Amendment extends to "actual loss or injury to the property." 49 U.S.C. § 14706. The Carmack
Amendment incorporates the common law principles of damages. *See* Wesley S. Chused, *The
Evolution of Motor Carrier Liability Under the Carmack Amendment into the 21st Century*, 36
Transp. L.J. 177, 187 (2009). The Ninth Circuit has emphasized that "[t]he general rule for
determining the amount of damages is the difference between the market value of the property in
the condition in which it should have arrived at its destination and its market value in the
condition in which it did arrive." *Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight
Lines, Inc.*, 661 F.2d 761, 764 (9th Cir. 1981); *see also F. J. McCarty Co. v. S. Pac. Co.*, 428
F.2d 690 (9th Cir. 1970). This rule, however, "is not absolute" and should not be applied "where
it is demonstrated that another rule will better compute actual damages." *F. J. McCarty Co.* 428
F.2d at 692 (quotation marks omitted). For instance, "[r]eplacement cost is an appropriate
measure of damages where the injured party could mitigate the loss by replacing the goods."
*Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1120 (9th Cir.
2000). The appropriate measure of damages is thus often dependent on the special circumstances
of an individual case.

Although the Carmack Amendment allows for general damages, it does not usually allow
for special or consequential damages. The Ninth Circuit defines "special damages" in this
context as "those that the carrier did not have reason to foresee as ordinary, natural consequences
of a breach when the contract was made." *Contempo*, 661 F.2d at 765. Damage is "foreseeable
by the carrier if it is the proximate and usual consequence of the carrier's action." *Travelers
Prop. & Cas. Co. v. Interstate Heavy Hauling Co.*, 2000 WL 900482, at *7 (D. Or. Feb. 16,
2000). A plaintiff cannot recover special damages unless it can show "that the carrier had notice

of the special circumstances from which such damages would flow." *Contempo*, 661 F.2d at 765. Notice of special damages such as labor costs must generally occur before the parties form a contract. *Id.* A carrier's actions may, however, imply notice. *Id.*

It is sometimes unclear whether certain categories of losses qualify as actual losses under the Carmack Amendment or as excluded special damages. For example, the Circuits differ in whether they allow recovery for freight charges as part of actual losses.[3] The Ninth Circuit has allowed recovery of freight charges where the plaintiff "received no benefit from the delivery." *Contempo*, 661 F.2d at 764. This Court has also found that expected profits qualify as actual losses rather than special damages. *Travelers*, 2000 WL 900482, at *10.

### b. CDS's Claimed Damages

Considering the evidence viewed in the light most favorable to AST, the non-moving party, the Court finds that CDS has not established a prima facie case under the Carmack Amendment for purposes of summary judgment because CDS has not proven the third element, damages.[4] AST concedes the first two elements: delivery in good condition and arrival in damaged condition. AST, however, raises a genuine dispute as to the third element, the amount of damages.

---

[3] For instance, the Seventh Circuit allowed a shipper "to recover the freight, taxes, fees and insurance only for the portion . . . of the shipment . . . that was damaged," *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys.*, Inc., 325 F.3d 924, 935 (7th Cir. 2003), whereas the First Circuit has denied recovery of prepaid freight charges where the plaintiff accepted delivery of damaged goods. *W. A. Stackpole Motor Transp., Inc. v. Malden Spinning & Dyeing Co.*, 263 F.2d 47, 52 (1st Cir. 1958).

[4] CDS also argues that summary judgment is appropriate because AST has not presented evidence of one of the five excepted causes of damage. The burden of proving an excepted cause of damage, however, does not shift to AST until CDS proves every element of its prima facie case. *See Mo. Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964) (citations omitted).

CDS argues that the claim documents presented by PNI should serve as the correct amount of damages.[5] The amount of damages in these claim documents is calculated based not just on PNI's product invoices, but also on computations made by PNI's Comptroller, James Kilcup. *See* Dkt. 86-2 at 1-7. Kilcup's spreadsheets purportedly demonstrate the full amount of PNI's loss. AST responds that these spreadsheets show cargo with significantly higher value than reflected on PNI's product invoices, producing inflated estimates of the value of PNI's unsalvageable product. Reviewing Kilcup's spreadsheets, AST calculates that they reflect cargo worth $158,853.56 for the shipment to Clearwater and $86,408.74 for the shipment to Tampa. Dkt. 90 at 24-28. PNI's product invoices, on the other hand, reflect cargo worth only $131,993.60 for the Clearwater shipment and $38,448 for the Tampa shipment. Dkt. 86-2 at 4. CDS explains this discrepancy by describing non-invoiced materials and samples that were shipped along with the product for which it charged its customers. Dkt. 93-1 at 2. As AST asserts, however, the claim calculations for the non-invoiced materials also appear inflated in some instances. For example, on the second page of Exhibit D of Kilcup's declaration, multiplying the number of damaged or "bad units" by the standard cost for Raw Item Number 29001 results in a lower claim cost than is reflected on the spreadsheet. Dkt. 90 at 26.

AST further asserts that in at least five instances, the number of salvaged units appears incorrect. For the non-invoiced product, AST subtracts the claimed costs from the total costs to verify the value of salvaged product. The amounts yielded by this calculation are, at times,

---

[5] CDS does not clearly state what measure of damages it wants the Court to apply. The final damages figure arrived at by PNI, and adopted by CDS, appears to be based in part on manufacturing or replacement costs rather than market value costs. Dkt. 86-2 at 5 ("'Unit Cost' is PNI's cost of manufacturing the Unit"). But CDS also relies on the market value of the product by repeatedly citing PNI's invoices to its customers. Moreover, CDS cites case law articulating the availability of case-specific damage rules but then does not provide a suggested rule for the Court to follow.

higher than would result from multiplying the listed number of salvaged units by the standard cost of the units. Dkt. 90 at 25. This leads AST to conclude that, in these instances, the number of salvaged units is actually higher than reflected on the spreadsheet and that this discrepancy calls into question how Kilcup arrived at the total amount of damages for the non-invoiced product. CDS offers no further explanation for Kilcup's calculations in response to AST's argument.

Finally, AST points out that that the PNI invoices offer five percent discounts to buyers who pay within one month of billing. Dkt. 86-2 at 11-17. AST argues that this makes the payments PNI would receive speculative based on the possibility of discounted rates. CDS offers no evidence of whether the relevant PNI customers normally received such discounts; instead, CDS argues that the full invoice price is the proper measure of damages because this reflects destination market value.  As previously discussed, destination market value, as reflected by product invoices, is often used as the measure of damages. Courts may, however, depart where a better rule will fully compensate the plaintiff. *See, e.g.*, *Illinois Cent. R. Co. v. Crail*, 281 U.S. 57, 64-65 (1930) ("The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable."). If PNI's relevant customers routinely receive a five percent discount, an amount other than the full invoice price may fully compensate CDS, standing in the shoes of PNI, for actual losses. Thus, AST has sufficiently demonstrated a genuine dispute regarding the amount of damages.

The Court also notes that some of the damages CDS claims may constitute special damages because the record does not conclusively establish whether AST reasonably should have foreseen them. In arriving at the amount of damages, CDS relies on many of Kilcup's

determinations regarding "materials and freight" and "labor and reworked product." Dkt. 86-2 at 5. Kilcup's damage calculations also include FedEx charges because one of PNI's customers needed an interim amount of replacement product to meet its needs. *Id.* at 6. The record does not conclusively establish that AST reasonably should have known about this customer's unique needs. Without proof of foreseeability, these damages may be unrecoverable special damages. *See Contempo*, 661 F.2d at 764.

Although CDS may recover for prepaid freight charges if PNI never received the benefit of AST's services, later freight charges (such as transportation back to PNI's Vancouver facility and additional shipments to Florida) may constitute unrecoverable special damages along with materials, labor, and reworked product unless they are the proximate and usual consequence of AST's actions. *Id.*[6] Thus, AST has raised a genuine issue of fact as to whether it had notice of the special circumstances from which these damages would flow.

### c. Whether AST May Challenge CDS's Claims

CDS argues that AST is barred from challenging the amount of damages. According to CDS, AST was contractually obligated to comply with the provisions of 49 C.F.R. § 370.9, the federal regulation regarding how carriers dispose of claims. CDS argues that because AST did not comply with certain administrative steps required by 49 C.F.R. § 370.9, as well as other sections of 49 C.F.R. Part 370, AST is bound by the amount of damages CDS asserts. CDS does not cite any cases and the Court was unable to locate any cases that have barred a carrier from disputing damages under the Carmack Amendment based on the carrier's non-compliance with 49 C.F.R. Part 370.

---

[6] Expected profit, on the other hand, may be recoverable as part of PNI's actual loss. *Travelers Prop. & Cas. Co. v. Interstate Heavy Hauling Co.*, 2000 WL 900482, at *10 (D. Or. Feb. 16, 2000).

CDS also argues that AST waived its opportunity to question PNI's calculation of damages by failing to depose PNI's representatives. The issue here, however, is whether AST, without having taken such depositions, has sufficiently raised a genuine dispute of material fact. AST points to several discrepancies in the underlying calculations made by PNI's comptroller, indicating that the number of salvaged units for non-invoiced product may be inaccurate. The possibility of discounted prices for PNI's customers also calls into question the correct measure of damages — thus, destination market value may overcompensate for actual loss if the relevant customers rarely paid the full invoice value. CDS fails to meet its burden at summary judgment to show that AST waived its right to challenge CDS's damage calculations.

**2. Breach of Contract**

**a. Contract Interpretation under Oregon Law**

Oregon law governs the validity and effect of the contracts between CDS and AST. *See InTransit, Inc. v. Excel N. Am. Rd. Transp.*, Inc., 426 F. Supp. 2d 1136, 1141 (D. Or. 2006) (holding that the Carmack Amendment did not preempt plaintiff-broker's claims against the defendant-carrier based on direct contractual indemnity rather than an assignment of the shipper's rights under the bill of lading).

Under Oregon law, courts interpret contracts to give effect to the parties' agreed-upon intentions. *See, e.g.*, *Connall v. Felton*, 225 Or. App. 266, 272 (2009) ("The goal [of contract interpretation] is always to give effect to the parties' intentions."). Oregon courts follow a three-step process for interpreting the provisions of a contract. *Yogman v. Parrott*, 325 Or. 358, 361, (1997). First, the court examines the text of the contract to determine whether, as a matter of law, the relevant provision is ambiguous. *Id.* In determining whether a contractual provision is ambiguous, "the trial court can properly consider the text of the provision in the context of the agreement as a whole and in light of the circumstances underlying the formation of the contract."

*Batzer Const., Inc. v. Boyer*, 204 Or. App. 309, 317 (2006). A provision "is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011) (citation omitted). If the provision is unambiguous, the analysis ends. *Id*.

If the contractual provision is ambiguous, the court will then proceed to the second step of contract interpretation. Here, the trier of fact considers "extrinsic evidence of the contracting parties' intent" and construes the contractual term consistent with that intent. *Yogman*, 325 Or. at 363. Because Oregon follows the objective theory of contracts, direct evidence may include actual "manifestations of intent, as evidenced by the parties' communications and acts." *Holdner v. Holdner*, 176 Or. App. 111, 120 (2001) (quoting *Real Estate Loan Fund Or. Ltd. v. Hevner*, 76 Or. App. 349, 354 (1985)). Evidence of wishes, ideas, or understandings that a party failed to express or communicate at the time of contract formation is not admissible to show intent. *See State v. Heisser*, 350 Or. 12, 21 (2011); *Kabil Developments Corp. v. Mignot*, 279 Or. 151, 156 (1977).

In the absence of admissible direct evidence, the parties' course of dealing or performance during the term of the contract may provide circumstantial evidence of their mutual understanding, if any, concerning the ambiguous provision. *See Tarlow v. Arntson*, 264 Or. 294, 300 (1973) ("How the original parties and their successors conducted themselves in relation to the agreement is instructive in our determination of what must have been intended."); *Goodman v. Cont'l Cas. Co.*, 141 Or. App. 379, 389 (1996) (parties' performance is persuasive evidence of meaning).

In the absence of both direct and circumstantial evidence of the parties' intent, or if the contract remains ambiguous after considering any such evidence, the third step is to apply any relevant maxims of construction. *See Yogman*, 325 Or. 358, 364 (1997).

When a contractual provision is ambiguous, ascertaining its meaning at steps two and three of the *Yogman* analysis constitutes a question of fact generally not appropriate for summary judgment. *Dial Temp. Help Serv., Inc. v. DLF Int'l Seeds, Inc.*, 255 Or. App. 609, 611, (2013) (noting that the "general rule" is that the meaning of a contract may be disposed of by way of summary judgment only if its terms are unambiguous); *Madson v. W. Or. Conference Ass'n of Seventh-Day Adventists*, 209 Or. App. 380, 389 (2006) ("Because the contract is ambiguous, ascertaining its meaning is a question of fact, and the trial court therefore erred in granting defendant's motion for summary judgment.").

Contract terms may incorporate other documents by reference. In Oregon, "[w]here a written instrument refers in specific terms to another writing, the other writing is a part of the contract." *Hous. Auth. of Jackson Cnty. v. Gates*, 246 Or. App. 521, 525 (2011) (quotation marks omitted). For example, a contract incorporates the terms and conditions of another document where the contract identifies the other document using a specific date. *See Pioneer Res., LLC v. Lemargie*, 175 Or. App. 202, 205 (2001). In contrast, language in a purchase order stating that a party must comply with all "plans and specifications" is insufficient to incorporate the prime contract by reference. *A-C Const., Inc. v. Bakke Corp.*, 153 Or. App. 41, 46 (1998).

The parties need not attach a document to the contract in order to incorporate the document by reference.  Where the parties have not attached the document, three factors, if "present together, demonstrate that multiple documents should be construed as a single contract: (1) the documents are made by the same parties . . . (2) the documents are executed at or about

the same time . . . and (3) the documents are part of the same transaction." *Arnett v. Bank of Am.,*

*N.A.*, 874 F. Supp. 2d 1021, 1030 (D. Or. 2012) (citations omitted).

> **b.   The 2010 and 2012 Contracts**

CDS argues that AST breached a contract that became operative in 2012 ("2012

Contract"). AST responds that it never signed or received a copy of the 2012 Contract.

According to AST, only the contract it signed on November 29, 2010 ("2010 Contract") binds

the parties. In response to AST's arguments, CDS asserts that confirmations AST signed for each

load it contracted to carry incorporated the 2012 Contract by reference.

In July 2012, CDS prepared the 2012 Contract and modified the load confirmations it

sent to carriers. CDS does not assert that AST ever received or signed a copy of the 2012

Contract. CDS, however, argues that the 2012 load confirmations "looked different" from the

previous ones and contained new language that should have alerted AST to a change in the

underlying contract. The previous load confirmations consisted of one page and stated at the

bottom, "This document and provisions herein supplement and/or modify the existing contract

between the parties, and are expressly made a part and incorporated therein." Dkt. 93-2 at 15.

The new 2012 load confirmations consisted of two pages and stated:

> Carrier agrees . . . to be bound by all provisions in this Load Confirmation
> and CDS's Broker-Carrier Motor Transportation Contract ("Contract"),
> the terms of which are incorporated by reference, regardless whether
> Carrier has signed either document,  it being agreed by Carrier that any
> service provided in connection with this shipment constitutes Carrier's
> agreement to be bound by all provisions of those documents.

Dkt. 86-1 at 31. AST signed approximately nineteen new load confirmations before signing the

confirmations for the December 2012 PNI loads at issue in this case. Dkt. 86-1 ¶ 10. AST

concedes that the new load confirmations operated as valid contracts between the parties.

Mikhail Maftey, an AST manager, stated in his declaration that he saw the new 2012 load confirmations and knew they referred to the "Broker-Carrier Motor Transportation Contract." Dkt. 92 ¶ 4. He assumed, however, that this was the 2010 Contract that he had personally signed. *Id.* Similarly, Dorel Maftey, another AST manager, similarly stated in his declaration that he knew that the new load confirmations referenced the Broker-Carrier Motor Transportation Contract but assumed this referred to the 2010 Contract that Mikhail Maftey had signed. Dkt. 91 ¶ 7.

Considering the text of the 2012 load confirmations and the circumstances in which the parties contracted, the Court finds that the meaning of the term "Broker-Carrier Motor Transportation Contract" is ambiguous. The confirmations stated that they incorporated the Broker-Carrier Motor Transportation Contract regardless of whether AST had signed it. The revised language of the load confirmations did not, however, indicate that the Broker-Carrier Motor Transportation Contract had been modified. Nor did the revised load confirmations specify any date or other indication showing what version of the Broker-Carrier Contract applied or has been incorporate by reference.

Further, the 2010 Contract allowed CDS to change the written agreement, stating: "Additional rates or modifications of the agreed rate . . . shall be made in writing and acknowledged by both CARRIER and BROKER . . . in a revised Transportation Services Agreement or a Load Confirmation issued by BROKER." Dkt. 86-1 at 18. This language only contemplates revisions in the form of rate modifications, not material changes in liability or indemnification requirements. Nothing in the 2012 load confirmations appears to put AST on notice of significant changes in the underlying contract. In light of the text, context, and circumstances of formation, the contractual term in the load confirmations is open to two

reasonable interpretations: that it referred to the 2010 Contract or that it referred to some other unspecified contract, which CDS maintains is the 2012 Contract.

Although CDS did not need to attach the 2012 Contract to the load confirmations to incorporate it by reference, the circumstances that manifestly evince incorporation are absent here. The 2012 Contract and the 2012 load confirmations were not executed at or around the same time because AST never signed the 2012 Contract. Thus, at least one of the factors required for incorporation is lacking. Additionally, the confirmations do not refer to the date of any document to be incorporated, as was the case in *Pioneer Resources, LLC v. Lemargie*. 175 Or. App. 202 (2001). This makes it unclear whether the load confirmations referred to the 2012 Contract in terms specific enough to incorporate the contract by reference. Because the load confirmations are ambiguous and do not clearly incorporate the 2012 Contract, the trier-of-fact must ascertain the meaning of "Broker-Carrier Motor Transportation Contract" using steps two and three of the *Yogman* analysis at trial.

### c.  Combining Shipments

CDS argues that AST breached its contract by combining the PNI shipments onto one truck. CDS, however, does not point to any provision in the 2012 Contract, the old or new load confirmations, or the 2010 Contract that expressly required AST to transport the shipments separately. Dorel Maftey states that AST never received any instructions from CDS regarding whether AST could combine the shipments. Dkt. 91 ¶ 10. He interpreted an instruction ("Do Not Stack On") written on one of the bills of lading for the shipments to simply require use of load lock equipment to create shelfs to separate the pallets. *Id.* ¶ 11. The alleged requirement that AST transport the shipments using two separate trucks remains in dispute regardless of whether the 2012 Contract or 2010 Contract applies.

### d. Refusing to Accept Liability and Pay for Loss

CDS also argues that AST breached its contract by (1) failing and refusing to accept its liability for loss and damages under the Carmack Amendment; and (2) failing and refusing to pay PNI or CDS for the loss and damages. Although CDS argues the 2012 Contract applies, it maintains that AST would still be liable for this breach under the 2010 Contract. The 2012 Contract states that if AST fails to dispose of a claim for damages within 60 days, AST will be "conclusively and strictly held to have accepted liability for the claim in the full amount thereof and shall pay the claim within thirty (30) days thereafter." Dkt. 86-1 at 22. The 2010 Contract does not contain this provision or any similar language. Because CDS does not identify a term in the 2010 Contract that would prohibit AST from disputing damages at this juncture, CDS has not offered sufficient evidence to prove that AST violated the 2010 Contract.

As an affirmative defense, AST argues that CDS was subject to a condition precedent in the 2010 Contract before it could bring this suit. According to AST, the condition precedent requires CDS to submit its breach of contract claim to the Surface Transportation Board ("STB") before commencing any other legal action. In response, CDS first argues that this affirmative defense is a nullity because it relies on the 2010 Contract. As discussed previously, however, CDS has not established that for purposes of this case the 2012 Contract governs.

CDS also asserts that the STB specifically told CDS that it could not arbitrate CDS's claims. AST responds that the STB only addressed whether it could entertain claims under the Carmack Amendment and never suggested that it would decline to decide claims for breach of contract between a broker and carrier. According to AST, CDS also misinterprets the context of

PAGE 16 – OPINION AND ORDER

the STB decision on which CDS relies. A genuine dispute of material fact exists regarding

whether CDS could and should have submitted its breach of contract claim to the STB.[7]

### e.  Failure to Maintain Sufficient Insurance

According to CDS, AST did not maintain insurance sufficient to compensate the parties

entitled to recover under the Carmack Amendment as required by both the 2012 and the 2010

Contract. AST raises the affirmative defense of breach of contract. AST argues that CDS had a

contractual duty, pursuant to the implied duty of good faith and fair dealing, to inform AST of

the value of the load it contracted to carry so AST could verify that it had adequate insurance.

### i.  Preemption

CDS argues that federal law preempts Oregon's implied duty of good faith. This

argument is unavailing. The Federal Aviation Administration Authorization Act ("FAAAA")

prevents a state from "enact[ing] or enforce[ing] a law, regulation, or other provision having the

force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C.

§ 14501. The United States Supreme Court interprets the FAAAA in line with the Airline

Deregulation Act ("ADA"). *Rowe v. N.H.  Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008).  The

Supreme Court has held that the ADA, and thus the FAAAA, preempts states' implied duties of

good faith where the states "[do] not authorize parties to free themselves from [the implied

duty]." *Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422, 1432 (2014). Preemption does not apply where

states use the implied duty of good faith "to effectuate the intentions of the parties or to protect

their reasonable expectations" as opposed to where states use the implied duty to "ensure that a

---

[7] In the alternative, CDS argues that even if a condition precedent existed, AST waived it
by failing to raise the affirmative defense in its Motion to Set Aside Default. AST did, however,
raise this affirmative defense in its first motion. *See* Dkt. 10 at 6.

party does not violate community standards of decency." *Id.* at 1431 (citations and quotation marks omitted).

Oregon is one of the former states; its implied duty of good faith serves to effectuate the intentions of the parties. *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) (noting that the implied duty of good faith "serves to effectuate the objectively reasonable expectations of the parties"). The Oregon Supreme Court has emphasized on numerous occasions that the implied duty of good faith cannot contradict express contractual terms to which the parties agree. *See, e.g.*, *U.S. Nat. Bank of Or. v. Boge*, 311 Or. 550, 567 (1991) (en banc) ("The obligation of good faith does not vary the substantive terms of the bargain . . . nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract or statute."); *Sheets v. Knight*, 308 Or. 220, 233 (1989), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532 (1995) ("It is not appropriate to imply the duty if it is inconsistent with a provision of the contract."). In *Arnett v. Bank of America, N.A.*, this Court articulated the law on the nature of Oregon's implied duties: "A duty of good faith and fair dealing . . . 'may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue.'" 874 F. Supp. 2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys. v. Or. Pub. Emps. Union, Local 503*, 185 Or. App. 506, 511 (2002)). FAAAA preemption thus does not apply to Oregon's implied duty of good faith.

### ii.  Implied Duty to Disclose Load Value

According to the managers of AST, it was standard practice in the motor carrier industry for a broker to inform the carrier of the value of a load prior to transport, particularly if the load had a high value. Dkt. 91 ¶¶ 7-8; Dkt. 92 ¶ 3. Thus, AST asserts that it expected CDS to notify it if the PNI load was of a high value. Where the parties reasonably expect that the implied duty of good faith incorporates industry standards and practices, Oregon courts will hold the parties to

PAGE 18 – OPINION AND ORDER

these standards and practices. *See Iron Horse Eng'g Co. v. Nw. Rubber Extruders, Inc.*, 193 Or.

App. 402, 421 (2004). AST has presented sufficient facts to show a genuine dispute exists

regarding whether industry practice included informing carriers of the value of loads, in which

case the CDS-AST contract may have incorporated this practice through the implied duty of

good faith. Accordingly, summary judgment is inappropriate.

### f.   Refusing to Indemnify

CDS argues that AST breached its contract by refusing to indemnify and hold harmless

CDS for all liability, costs (including attorney's fees), and loss incurred due to PNI's claims and

AST's purported breach of contract. The 2012 Contract contains more expansive indemnification

language than the 2010 Contract. The 2012 Contract specifies:

> CARRIER's obligation to defend, hold harmless and indemnify CDS under this
> subparagraph 4.k shall extend and obligate CARRIER to reimburse CDS for any
> and all administrative expense, attorney fee, adjustment fee, insurance deductible,
> or other cost, fee or expense, of whatever kind, incurred by CDS in connection
> with any matter for which CARRIER is liable for under this Contract . . . .

Dkt. 86-1 at 23. In contrast, the 2010 Contract provides:

> CARRIER agrees to defend and hold harmless BROKER against any and all loss
> or damage claims on each shipment transported by CARRIER pursuant to this
> Agreement. CARRIER further agrees to defend and hold harmless BROKER
> from any and all liability, costs and damages to persons and/or property arising
> out of CARRIER's operations hereunder, including but not limited to all road,
> fuel, other taxes, fees, or permits, related to the shipments transported by
> CARRIER as arranged by BROKER.

Dkt. 86-1 at 17. CDS maintains that even if the 2010 Contract applies, it and the 2012 load

confirmations required AST to defend and hold harmless CDS from all liability.

CDS emphasizes that the new load confirmations stated that the Carrier agreed "to

indemnify, defend, and hold [CDS] harmless from and against any and all liability, claim, cost,

expense, penalty, damage, or the like arising out of the service provide and/or agreed but failed

to be provided by AST." Dkt. 86-1 at 39, 41. AST responds that the 2010 Contract and load confirmation provisions apply only to third-party claims against CDS.

Oregon courts have interpreted the contractual term "hold harmless" to mean "an obligation to defend, or to reimburse for the costs of defense, when an action within the terms of the agreement is filed against the indemnitee." *Sunset Presbyterian Church v. Andersen Const. Co.*, 268 Or. App. 309, 315 (2014) (quoting *U.S. Fire Ins. Co. v. Chrysler Motors*, 264 Or. 362, 369 (1973)). AST asserts that CDS unilaterally assumed PNI's claims against AST and that PNI never filed any claim against CDS. In CDS's Second Amended Complaint, AST points out, CDS acknowledged that it paid PNI "[s]olely for business purposes." Dkt. 80 ¶ 9. Because CDS voluntarily stepped into PNI's shoes, AST argues that it never had to hold CDS harmless under Oregon case law. CDS does not offer evidence that the parties understood the 2010 Contract or load confirmations to require AST to defend CDS even if a third party never filed an action. CDS thus has not shown that the "hold harmless" language of the 2010 Contract or 2012 load confirmations unambiguously required AST to compensate CDS for its voluntary payments to PNI.

AST further asserts that in so far as CDS seeks indemnification for its own costs and attorney's fees incurred due to AST's alleged contract breach, the indemnity provision of the load confirmations does not apply. According to AST, indemnity provisions do not apply to actions or claims between indemnitor and indemnitee. In support of its argument, AST relies on *PacifiCorp v. SimplexGrinnell, LP*. 256 Or. App. 665, o*pinion adhered to as modified on reconsideration*, 257 Or. App. 677 (2013). This case concerned an indemnification clause requiring a party to "indemnify, defend, and hold harmless [the other party] against and from any and all claims, demands, suits, losses, costs and damages of every kind and description,

including attorneys' fees and/or litigation expenses." *Id.* at 668. Based on this clause, the indemnitee attempted to recover attorney's fees for enforcing a contract against the indemnitor. The Oregon Court of Appeals pointed out that if the indemnification clause applied to actions between the parties, the indemnitor could be required to indemnify the indemnitee for wrongs the latter committed against the indemnitor. The court refused to reach such "an absurd result." *Id.* at 673. The court thus found that the indemnification clause did not apply to a suit between the indemnitor and indemnitee.

The text of the 2012 load confirmations is almost identical to the text of the indemnification clause in *PacifiCorp*. CDS's load confirmations do not, however, indicate whether the parties intended to contract for a different result than in *PacifiCorp* and require AST to indemnify CDS in suits between the parties. The Court thus finds that the indemnification requirements in the 2010 Contract and in the 2012 load confirmations are ambiguous at best. In any event, they do not support summary judgment on this issue in favor of CDS.[8]

### 3. Right to Offset

CDS asks the Court to declare that it has a right to withhold $51,700 in payments owed to AST for 11 shipments in November 2012. According to CDS, the 2012 Contract and the 2012 load confirmations give CDS the right to withhold payments and credit them toward any amount AST is adjudicated as owing CDS. As discussed above, there remains an issue for trial as to what contract applies to the shipments in question. The Court thus cannot decide what rights CDS has under the 2012 Contract at this point.

---

[8] The Court notes that the 2012 load confirmations contained a separate attorney's fee provision. *See* Dkt. 86-1 at 39, 41. This provision would entitle the prevailing party in a lawsuit to recover attorney's fees regardless of the applicability of the indemnification clause. The relevance of *PacifiCorp* and the indemnification clause, however, is whether AST breached the contract with CDS by failing to pay CDS's costs, including attorney's fees, thus far.

The 2012 load confirmations signed by AST state "that CDS is authorized, without prior notice, to offset and deduct amounts owed to CDS by Carrier under foregoing paragraph (a) [providing for indemnity] from any and all amounts CDS may owe Carrier." Dkt. 86-1 at 39, 41. AST argues that this provision applies only to amounts, if any, owed for indemnification, not to amounts owed pursuant to the assigned Carmack Amendment claim. The offset provision in the 2012 load confirmations directly follows the indemnification clause. The provision could reasonably be construed as applying only to amounts owed for indemnification, and as discussed above, AST argues that the indemnification clause does not apply to suits between CDS and AST. The text and context of the contract are ambiguous regarding whether the offset provision applies in this case as CDS argues. Summary judgment in favor of CDS is not appropriate on this claim for relief.

**B.  AST's Counterclaims for Breach of Contract, Money Had and Received, and Consequential Damages**

AST argues that CDS owes $51,700 in withheld payments with interest. CDS moves the Court to enter a judgment dismissing these counterclaims with prejudice. For the same reasons the Court denies summary judgment on CDS's offset claim, it denies summary judgment on this issue. The amount of damages owed by either party remains an issue for trial.

### CONCLUSION

Plaintiff CDS's Motion for Summary Judgment (Dkt. 86) is DENIED.

**IT IS SO ORDERED**.

DATED this 30th day of September, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge